UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| G & G CLOSED CIRCUIT EVENTS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> BUKHARI NAJEEULLAH BAASET, et al., <br><br> Defendants. | Case No. 24-cv-00089-EMC <br><br> **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO STRIKE** <br><br> Docket No. 73 |

Plaintiff G&G Closed Circuit Events, LLC has filed suit against Defendants Najeeullah Baaset (individually and d/b/a BNB Wings N' Things) and BNB Wings N' Things LLC ("BNB LLC"). According to G&G, Defendants run a commercial establishment and, on April 22, 2023, unlawfully intercepted and broadcast a program for which G&G had the exclusive nationwide commercial distribution rights. Now pending before the Court is G&G's motion to strike affirmative defenses raised in Defendants' second amended answer. Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the motion to strike.

The affirmative defenses at issue are: (1) failure to mitigate damages and (2) unclean hands. For the first affirmative defense (failure to mitigate), Defendants allege that G&G had to have known Defendants were going to broadcast the program because it hired a private investigator who went to the establishment in the first place (*i.e.*, the investigator going to the establishment and seeing the broadcast of the program was no accident). *See* Affirm. Def. ¶¶ 1-2. That G&G and/or its investigator knew about the program beforehand is also supported by the allegation that Defendants were advertising on social media that they were going to be showing

the program. *See* Compl. ¶ 16. Defendants allege that, because G&G knew about the upcoming broadcast at the establishment, it could have taken action before the broadcast to stop it from happening. *See* Affirm. Def. ¶ 3. According to G&G, the very least, G&G's investigator – while actually visiting the establishment – could have stopped the broadcast, either when it was about to happen or in the middle of the broadcast. *See* Affirm. Def. ¶ 4.

For the second affirmative defense (unclean hands), Defendants make the same basic allegations and also add the following allegations: (1) Defendants purchased the right to show the program from their Showtime app; (2) G&G allowed the broadcast to take place in the establishment – even though it could have stopped it – "to create unnecessary litigation"; and (3) G&G has a pattern and practice of conducting itself this way, having filed "over 350 nationwide cases." Affirm. Def. ¶¶ 12-13.

The Court agrees with G&G that the unclean hands affirmative defense should be stricken. Defendants have not made a showing that G&G engaged in such inequitable conduct that it should be barred from asserting a claim altogether. This is not a situation where, *e.g.*, G&G "induce[d] [D]efendants into broadcasting the program illegally." *J&J Sports Prods. v. Bouton*, No. 12-cv-05762-RS, 2015 U.S. Dist. LEXIS 194069, at *6 (N.D. Cal. May 13, 2015). Nothing akin to entrapment or similarly egregious conduct is alleged.

As for the affirmative defense of failure to mitigate, the Court strikes it in part. To the extent Defendants argue that G&G could have prevented its injury from happening *in the first place*, that cannot be the basis of a failure-to-mitigate defense. "The duty to mitigate arises after an injury occurs, not before. . . . [M]itigation is a method of apportioning damages where the party, 'subsequent to infliction of the harm,' fails to reasonably avoid loss. Other circuits agree that the 'duty' arises only after injury." *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 274 (5th Cir. 2020); *see also id.* at 274 n.12 (noting that the Restatement (Second) of Torts characterizes mitigation as the doctrine of avoidable consequences, and, under that doctrine, "'one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure *after the commission of the tort*'") (emphasis in original).

2

1     That being said, it is not clear whether G&G could have reduced its losses once
2 Defendants began to show the program at the establishment but before the broadcast was
3 complete.  For example, G&G has asserted a claim for conversion and seeks as part of its damages
4 the "commercial license fee to which [it] was rightfully entitled to receive."  Compl. ¶ 38.  The
5 license fee, however, could have turned on the number of patrons at the establishment and, if
6 G&G had its private investigator "intervene[] to shut off the Program at any point after his arrival,
7 some of [the] patrons conceivably might have returned to their homes to purchase and view the
8 Program privately [which] could have reduced the losses [G&G] incurred from defendants' failure
9 to purchase a license."  *Bouton*, 2015 U.S. Dist. LEXIS 194069, at *7-8 (stating that "there exists
10 a plausible theory by which plaintiff could have mitigated its damages after defendants began
11 illegally intercepting" and thus allowing the mitigation defense to advance).  As another example,
12 G&G has asserted a claim for violation of California Business & Professions Code § 17200 and
13 seeks as part of its restitution disgorgement of ill-gotten gains.  Ill-gotten gains could include
14 profits made on food and drink, which – as above – could turn on the number of patrons at the
15 establishment.[1]  To be sure, as a factual matter, G&G may be able to demonstrate it was neither
16 practical nor reasonable for the investigator to intervene.  For instance, it may not have been
17 possible to verify whether G&G had purchased the license at the last minute.  Or the risk of
18 confrontation with patrons could have provided good reason not to intervene in the broadcast.
19 / / /
20 / / /
21 / / /

---

[1] The number of customers could also affect statutory damages which Plaintiffs seek for violation of the Communications Act of 1934 (47 U.S.C. § 605) and the Cable & Television Consumer Protection and Competition Act of 1992 (47 U.S.C. § 553) – though admittedly, this would not fall under the rubric of failure to mitigate.  *See, e.g.*, *Kingvision Pay-Per-View, Ltd. v. Zalazar*, 653 F. Supp. 2d 335, 340 (S.D.N.Y. 2009) (noting that, "[w]hen determining statutory damages under section 605, courts generally choose between two methods of calculation – a per-customer damage calculation or a flat-sum award"; "[t]he per-customer approach employs a formula that multiplies a dollar amount per customer by the number of patrons present during the unauthorized exhibition" while the flat-sum approach involves consideration of factors such as "the financial loss to the plaintiff, the costs that the defendant avoided, the profits realized by the defendant as a result of the event, the financial burden of an award on the defendant, and the adequacy of the deterrent effect").

And depending upon the nature of the relief sought, intervention once the program started may not have averted any of the damages sought.  The Court, nonetheless at this juncture, does not strike the affirmative defense of failure to mitigate in its entirety as this is simply the pleading stage.

This order disposes of Docket No. 73.

**IT IS SO ORDERED**.

Dated: September 5, 2025

_____
EDWARD M. CHEN
United States District Judge